NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 240570-U

NO. 4-24-0570

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 31, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | McLean County No. 22CF1229 |
| v. | ) ) | |
| APRIL STARR MENCH, | ) ) | Honorable William A. Yoder, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court reversed, finding the State failed to prove defendant obstructed justice where no evidence was presented that defendant's actions materially impeded the prosecution or apprehension of any person.

¶ 2     Defendant, April Starr Mench, appeals her conviction for obstructing justice under a theory of accountability. She raises three arguments on appeal. First, she argues the evidence was insufficient to convict her where the State failed to prove (1) she intended to obstruct the prosecution of Richard Gaines and (2) the false information given to authorities materially impeded the administration of justice. Second, she argues she was denied the right to a fair trial where the jury did not receive an instruction on accountability. Finally, she argues that her sentence was excessive where the trial court failed to consider her potential for rehabilitation and the mitigating factors of her mental illness and drug addiction.

¶ 3　　　　We agree with defendant's first argument and reverse on that basis.

¶ 4　　　　　　　　　　I. BACKGROUND

¶ 5　　　　On December 7, 2022, defendant was charged with one count of involuntary sexual servitude of a minor (720 ILCS 5/10-9(c)(2) (West 2022)) and one count of obstructing justice (*id.* § 31-4(a)(1)). Count I alleged that from January 2022 to July 2022, defendant knowingly provided her minor daughter, J.C., to an adult male named Richard Gaines, knowing that Gaines would engage in commercial sexual activity with J.C. Count II alleged that on or about August 8, 2022, defendant, with the intent to obstruct the prosecution of Gaines, knowingly directed J.C. to furnish false information to Bloomington police officers during a Children's Advocacy Center (CAC) interview. The indictment for count II included in the language of the charge that defendant was "legally responsible for J.C."

¶ 6　　　　Defendant's trial began on November 6, 2023. The State's first witness, J.C., testified that she met Gaines in December 2021. At the time, J.C. and her family, including defendant, lived at a Quality Inn where Gaines also stayed. J.C. stated that on the day she met Gaines, she and defendant were outside the hotel in defendant's car, smoking marijuana and drinking. When J.C. left the car to get food, she passed Gaines, who said, " 'Hey, Gorgeous.' " She told Gaines she was only 14 years old, but Gaines followed her back to defendant's car, and continued to flirt with her. J.C. testified that defendant told Gaines to leave J.C. alone, but Gaines eventually joined the two in the car to drink and smoke. From that point on, J.C. testified that she, defendant, and Gaines spent "[a]ll day[,] every day" together.

¶ 7　　　　J.C. stated that being around Gaines made her uncomfortable, but when she voiced this to defendant, defendant assured her that she would be fine and defendant would not let anything happen to her. Defendant began leaving J.C. alone with Gaines, and during these

times, Gaines touched her inappropriately, including kissing, groping, and, on multiple occasions, sexual intercourse. J.C. testified that the first time Gaines had sex with her, she told defendant "right after it happened." Defendant said she would speak to Gaines, but the abuse continued. J.C. stated that defendant would tell her to stay at the hotel with Gaines while defendant went to buy drugs and, upon defendant's return, the two adults would use the drugs together. When asked if she felt that defendant was "prostituting" her to Gaines, J.C. answered affirmatively, stating, "[S]he wasn't doing anything to help me. She was pretty much allowing it to go on. She was getting drugs from it, too." She added that defendant referred to Gaines as J.C.'s "boyfriend" and "fiancé."

¶ 8   J.C. testified that she was interviewed at CAC about her relationship with Gaines. During her interview, she stated that she and Gaines were not involved. On the stand, she confirmed this was a lie. When asked why she lied, she answered, "Because I still loved my mom and I was talking to her." J.C. eventually requested a second CAC interview in order to tell the truth. On cross-examination, J.C. confirmed that, at the time of her first CAC interview, she believed Gaines had already told authorities that he and J.C. had a sexual relationship.

¶ 9   The State's second witness, Sergeant Jesse Lanphear, testified that in July 2022, he was a general detective with the Bloomington Police Department and was assigned to investigate an unrelated case involving defendant. While investigating that case, he confiscated several cell phones, two of which belonged to Gaines. Sergeant Lanphear became aware of the possibility of a relationship between J.C. and Gaines based on photos in one of Gaines's phones and "the way [Gaines] labeled contacts." He stated he spoke to several individuals about the relationship and arranged for J.C. to be interviewed at the CAC. After the interview took place, he became aware of communications between defendant and J.C. and reviewed the phone logs at

the jail where defendant was being held. Excerpts from five recorded calls defendant had while in jail were admitted into evidence without objection.

¶ 10        In the first call, defendant speaks to her mother, Robin Ferraro, whom J.C. and her younger brother were staying with. Defendant states that, to her knowledge, J.C. and Gaines were never left alone and were always supervised. She adds, "I have my suspicions. Especially when [J.C.] asks for a test," but notes that "[u]nless the tests came out positive, I can't say or do anything." Defendant states that her husband told her Gaines had not been arrested, leading her to believe that neither Gaines nor J.C. told authorities the two had sex. Ferraro corrects defendant, informing her that authorities had not yet spoken to J.C.

¶ 11        In the second call, placed shortly after the first, defendant speaks to her husband, John Mench, stating, "Mom just informed me that [the Illinois Department of Children and Family Services (DCFS)] *** asked her to bring the kids over to the [CAC] on Tuesday to be interviewed." Defendant asks John to speak to their kids, stating, "[Y]ou know what I mean by—talking to them?" John replies affirmatively. Defendant states, "Because frankly I could care less what happens to him at this point but I know that it'll kill her and it could hurt us all."

¶ 12        In the third phone call, defendant speaks to J.C., telling her that when she has her CAC interview to "remember what Mom and you had said." J.C. responds, "The whole reason we got taken away is because he said we're in a fucking relationship." Defendant replies, "Yeah, I know, but *** you need to let them know that we told you guys you could not have a physical relationship, that you could only get to know each other." J.C. states, "Drew said that if we lie he will call them and tell them we're lying," to which defendant responds, "Well[,] he better have proof of it." We note that it is unclear from the record who "Drew" is. Defendant then tells J.C. that if she wishes to tell the interviewer she has been intimate with someone, to tell them it was

- 4 -

with a "kid from youth group." The excerpt concludes with defendant stating:

> "[I]f you tell them anything different than what Mom and you were talking about right now, they're going to try to keep you from coming home to Mom and Dad. But if you listen to Mommy and you tell them what we said, which was that you guys could get to know each other but nothing else because you were too young, the case will be unfounded."

¶ 13　　In the fourth call, placed the same day as the third, defendant again speaks to J.C., reminding her "there are certain things that we can't talk about to anyone." Defendant then speaks to G.C., J.C.'s younger brother, stating

> "Tomorrow is one of those days where there are certain things that you have to watch what you say—And, you have to remember that I told your sister she could not have a relationship with him, that she was only allowed to talk to him until she was older."

She tells G.C. that once DCFS "unfind[s]" the case, the children will be returned to defendant and their father and "the only way the case is going to be unfounded is if you watch what you say to them." G.C. tells defendant their father wants them to lie. Defendant replies, "No, Dad doesn't want you to lie, Dad wants you to tell them the truth, that we said that your sister could not do anything but get to know him."

¶ 14　　In the fifth call, placed the same day, defendant speaks to John, telling him not to talk to the children around any other family members, stating, "Because I had already told you not to talk to them yesterday around anyone and evidently you did and now Drew is *** threatening the kids by telling them that he is going to say we're telling them to lie—which is not the truth."

¶ 15    After the calls were played for the jury, the State rested. Defense counsel moved for a directed verdict on both counts. The trial court denied the motion. Defense counsel stated he would not be presenting evidence.

¶ 16    The trial court and counsel then discussed jury instructions. The State tendered 24 instructions, including the following definition of obstruction of justice: "A person commits the offense of obstructing justice when, with intent to obstruct the prosecution of any person, he, or one for who[m] he is legally responsible, knowingly furnishes false information." The State also tendered instructions stating that, to sustain the charge of obstructing justice, the State must prove two propositions:

> "*First Proposition*: That the defendant, or one for whose conduct he is legally responsible, knowingly furnished false information; and
>
> *Second Proposition*: That the defendant, or one for whose conduct he is legally responsible, did so with intent to obstruct the prosecution of Richard Gaines."

Defense counsel tendered one jury instruction, stating that defendant's decision not to testify should not be held against her. Neither party objected to any jury instruction.

¶ 17    During closing arguments, in discussing the obstruction of justice charge, the prosecutor stated:

> "The first proposition is that the defendant, or one for whose conduct he is legally responsible, knowingly furnished false information; and that the defendant or one for whose conduct he is legally responsible, did so with intent to obstruct the prosecution of Richard Gaines.
>
> *** We know [J.C.] furnished false information. So, the question for you

is to determine whether or not the defendant was \*\*\* legally responsible for that. And the evidence that was presented to you for this is contained in those jail calls and transcripts that you have before you to review with regard to that."

¶ 18 During deliberations, the jury sent a note to the trial court, asking why the second proposition of the obstructing justice charge referred to Richard Gaines. The court wrote back, "The jury instruction outlining the propositions for the offense of Obstructing Justice is properly phrased pursuant to the language of the Bill of Indictment. You are to rely upon your recollection of the evidence and the law as instructed."

¶ 19 The jury found the defendant guilty of only count II, obstructing justice. Defendant filed a motion for judgment of acquittal notwithstanding the verdict or, in the alternative, a motion for a new trial. In her motion, she alleged the trial court erred in denying her motion for a directed verdict on count II and that the jury's finding on count II was against the manifest weight of the evidence.

¶ 20 At a hearing on January 3, 2024, the trial court denied the motion, finding the totality of the evidence supported the jury's verdict. The case then proceeded to sentencing. The presentence investigation report detailed defendant's numerous past convictions. The report noted that defendant had a " 'chaotic, turbulent' " childhood, in which she was repeatedly given up and taken back by her biological parents. Both of defendant's parents were addicts, and defendant reported that her biological and adoptive fathers both sexually abused her as a child. The report stated that defendant had, at different times, been diagnosed with persistent depressive disorder, posttraumatic stress disorder, unspecified anxiety disorder, antisocial personality disorder, borderline personality disorder, severe alcohol use disorder, severe cannabis use disorder, severe amphetamine-type substance use disorder, and severe cocaine use disorder.

Defendant reported she did not feel the need to use drugs or alcohol since beginning treatment.

¶ 21    The trial court sentenced defendant to five years and six months in the Illinois Department of Corrections, to run consecutively with the sentence defendant was already serving on an unrelated offense, followed by six months of mandatory supervised release. Defendant filed a motion to reconsider the sentence, which was denied.

¶ 22    This appeal followed.

¶ 23                                II. ANALYSIS

¶ 24    On appeal, defendant argues (1) the State failed to prove her guilty of obstruction of justice where it did not prove either that she had the intent to obstruct Gaines's prosecution or that the obstruction materially impeded the administration of justice, (2) she was denied her right to a fair trial where the jury was not instructed on accountability, a "fundamental element of the charged offense," and (3) her sentence was excessive.

¶ 25    "The due process clause of the fourteenth amendment to the United States Constitution [(U.S. Const., amend. XIV)] requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). In determining whether the evidence presented at trial was sufficient to support a conviction, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.* To interpret the evidence in the light most favorable to the prosecution means to allow all reasonable inferences from the record in the prosecution's favor. *Id.* at 280. On review, the determinations of the factfinder are entitled to great deference. *Id.* A criminal conviction will only be set aside where "the evidence

is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 26　　　　A person obstructs justice when, with the intent to prevent the apprehension or obstruct the prosecution or defense of any person, she knowingly commits one of the enumerated acts in section 31-4(a) of the Criminal Code of 2012. 720 ILCS 5/31-4(a) (West 2022). Included in this list is the act of furnishing false information. *Id.* So, to prove defendant obstructed justice, the State was required to prove that she knowingly instructed J.C. to lie during her CAC interview, with the intent to obstruct Gaines's prosecution. See *People v. Gray*, 146 Ill. App. 3d 714, 716 (1986). Additionally, to prove obstruction of justice, the State had to show that defendant's actions materially impeded the administration of justice. *People v. Casler*, 2020 IL 125117, ¶ 53.

¶ 27　　　　Defendant first argues the evidence presented did not establish she was aware, at the time of J.C.'s first CAC interview, that J.C. and Gaines had a sexual relationship, and it therefore did not establish she knowingly provided false information. She acknowledges that J.C. testified that defendant knew of the relationship. However, she argues this testimony is negated by the jail phone calls in which defendant tells her mother that she had suspicions regarding the relationship between her daughter and Gaines but did not know with certainty that the two were sexually involved.

¶ 28　　　　We are unconvinced by defendant's argument. Defendant has established only that the jury heard conflicting evidence at trial and chose to believe J.C. was being truthful in her testimony and defendant was being untruthful in her conversations with her mother. This is not an unreasonable conclusion.

¶ 29　　　　Defendant next argues that, even if she knew of the relationship between J.C. and

Gaines and encouraged J.C. to lie in her CAC interview, the evidence did not show that she did so with the intent to obstruct Gaines's prosecution. Instead, defendant argues that the jail phone calls establish she was indifferent to Gaines's prosecution and motivated only by a desire to regain custody of her children.

¶ 30    While it is true that defendant made frequent references to the DCFS case in her phone calls and encouraged her children to provide information in order to terminate the DCFS case, this does not necessarily suggest that she did not also intend to disrupt Gaines's prosecution. Nor does her statement to her husband that she "could care less what happens to" Gaines suggest so. In fact, these statements might be seen as suggesting the opposite. If defendant's concern was primarily with returning her children home and the reason the children were removed was, according to J.C.'s statement to her mother in one of the jail phone calls, because Gaines told authorities that he and J.C. were in a relationship, then defendant may have had significant incentive to disrupt Gaines's prosecution. She may have believed that doing so would benefit her in her desire to have the children returned home.

¶ 31    Intent need not be shown by direct evidence but may be inferred from proof of surrounding circumstances. *Gray*, 146 Ill. App. 3d at 717. Here, the evidence showed defendant knew of an investigation into Gaines's relationship with her daughter and knew her daughter was scheduled to be interviewed for purposes of that investigation. J.C. testified defendant encouraged her to lie in that interview and say she and Gaines had not had sex. From this, we find that a reasonable jury could find defendant intended to obstruct the prosecution of Gaines.

¶ 32    Defendant also argues the State failed to present any evidence that the false statements J.C. made in her initial CAC interview materially impeded the administration of justice. We agree.

¶ 33    The State argues that a material impediment was proven where

"[t]he record shows that, after J.C.'s first CAC interview, Gaines was not arrested

for his sex crimes against J.C. because J.C. had lied ***. *** [U]ntil she chose to

contact the police for a second interview in November in order to tell the truth,

[citation], there was not even enough probable cause to arrest Richard Gaines, let

alone prove his guilt beyond a reasonable doubt."

¶ 34    While this would certainly benefit the State's argument if true, we do not find

proof of it in the record. No evidence was presented at trial regarding the investigation, arrest, or

prosecution of Gaines. The State did not argue Gaines's arrest was in any way delayed by J.C.'s

statements in her first CAC interview or even provide the date of Gaines's arrest (assuming he

was arrested) to allow the jury to infer such an effect. No witness was questioned on this point,

including Sergeant Lanphear, the detective assigned to investigate Gaines's case. The State also

did not reference this element in its closing argument, and the jury was not instructed on the

necessity of finding that defendant's acts materially impeded the prosecution of Gaines.

¶ 35    In fact, as defendant argues, the evidence presented at trial tends to contradict the

State's argument that J.C.'s statements were integral to the prosecution of Gaines. It was

suggested at trial that J.C.'s statements were not the only evidence implicating Gaines. Sergeant

Lanphear testified to finding corroborating evidence in Gaines's phone, and a phone call between

J.C. and defendant referenced the children being taken from respondent after an unnamed "he,"

presumably Gaines, told authorities that a relationship existed between the two. J.C. confirmed

this in her testimony, stating that, to her knowledge, Gaines had already confessed the

relationship to police at the time of her first CAC interview.

¶ 36    Regardless, evidence tending to show that J.C.'s false statements did not

materially impede the investigation is unnecessary where the State offered no evidence to allow a jury to find that they did. The State failed to prove an essential element of the crime of which defendant was convicted. Because of this, we find no reasonable person could have convicted defendant, and defendant's conviction must therefore be reversed.

¶ 37        Because we reverse defendant's conviction based on insufficient evidence, we will not address her remaining arguments concerning jury instructions and sentencing.

¶ 38                              III. CONCLUSION

¶ 39        For the reasons stated, we reverse the trial court's judgment.

¶ 40        Reversed.